And you are, let's see, Mr. Munderloh? That's correct. Good morning, sir. You may proceed. Good morning. May it please the court. My name is Matt Munderloh. I'm from Omaha, Nebraska. I represent the appellant, Mr. Kirk Vester. This case is a 42 U.S.C. Section 1983 case where Mr. Vester in district court alleged that Daniel Hallock, the defendant, then a Pierce County sheriff's deputy, arrested him using excessive force. The real issue in the case is whether one has a clearly established right to be free from being thrown on his face and head when he puts his hands up in the air, has his hands down by his side, and then engages in the very usual maneuver of turning around, placing his hands on his car, waiting to be cuffed. But instead of being cuffed, the arresting officer, in this case, Mr. Hallock, approaches him, grabs his hands, and instead of cuffing him, he throws him on his head and face. Is it admitted that the officer had reason to believe that Mr. Vester might have had a knife in his car or on his person? So when the officer was dispatched, he learned from the dispatch report through the radio traffic that Mr. Vester perhaps had a knife in the bar. That was a report. There was some report that he was... I think the report wasn't that he perhaps had one. The report was that he did have one. Isn't that right? The report was that the barkeep in Hayter, Nebraska, had retrieved a knife from him while he was in the bar. And we will admit that there was also a report that Mr. Vester indicated that he had another knife in the car. Which he was going to go out and get. Correct. Okay. So that's just... I mean, that's part of the background of the summary judgment. Correct. But once Deputy Halleck arrives, he, in my view, sees that Mr. Vester had no knife on his person. He was slow in responding, was he not? I looked at the video. Sure. He's slow in responding. He's intoxicated. I don't think that that's disputed. He's under the influence. And so his reactions are delayed. He's not able to appreciate these commands. But eventually, he does step out of the vehicle. And once he gets out of the vehicle, I think it's obvious from the video that he has no knife. He certainly isn't holding one in his hand. Doesn't mean he didn't have one in his pants or on the seat of the car. Having one in his pants may be a fair point. However, my memory of the video is that he's wearing basketball shorts that are baggy. I'm not sure where a knife would be held in there. It's much like other cases in this circuit where, you know, someone is wearing just a towel or a bathrobe. Any officer could say in any circumstance, well, you may have had a knife under your towel, or you may have had a knife in your bathroom. He was also slow in responding to the officer's commands, was he not, to get out of the car. In fact, he never did comply, did he? He was supposed to get down, isn't that right? He complied in the sense that he did get out of the car. After five requests. After five requests over the course of maybe 10 to 15 seconds. And then three more requests that he get down. Correct. And he doesn't get down. Correct. Instead, he puts his hands on the vehicle. The officer approaches him.  And it's at that point where Mr. Vester maintains that the force that was used was simply not necessary. Because if we're getting to the point where the officer is able to grab the suspect's hands and say, give me your hands, which he does, and the hands are behind his back. At that point, you cuff the suspect. You don't throw him on his face and hit him requiring medical treatment. Both hands behind his back? I think so. As I remember the video, the officer approaches him from behind and says, give me this hand. He takes it. Give me your hand or give me your right arm or something. I think he says, give me your hand. And Mr. Vester's right hand then goes behind his back. And I do think that there is the left hand going behind as well. And that's when Mr. Halleck uses the arm bar technique and throws him on the ground. When you look at the video, I think it just, the video itself belies the idea that he couldn't have been cuffed in that circumstance at that time. And because there's no evidence that he couldn't have been cuffed at that time, I would submit that the force that was used was just not necessary. It was gratuitous. The district court found, seems to have found, that this right is not clearly established. And I say seems to have found because in the order halfway into it, there seems to be a finding that it's not clearly established. But then at the end of the opinion, there's some statement that it may be established. Well, if it may be clearly established, then the officer shouldn't have received summary judgment. In any event, there may not be a case directly on point here, but Mr. Vester submits that there doesn't need to be because it's just so obvious. When you watch the video again, when your hands are on the car, I'd submit that you're not a threat to the officer. No verbal threats were made. When the hands are on the car, there's no indication that you have a knife in your hand. You don't have access to a knife because your hands are on the car. You're not attempting to run away. You're not yelling profanities, making verbal threats, all the other sorts of things that many cases describe. We don't have that here. Instead, we have hands on the car, no movements whatsoever by Mr. Vester. And he expected to be cuffed. He should have been cuffed. The fact that he wasn't, but was instead thrown on his face and head is- Does the defendant in that circumstance have the constitutional right to choose the manner in which he's going to submit to the officer's request? I'm sorry, I'm not sure I- I'm not sure I understand what I'm saying. But what gave your client the idea that he could, with impunity as it were, refuse to comply with the deputy sheriff's request or order to get on their knees? Candidly, I just don't think he understood. He may have been drunk, I suppose. I suppose that's another example of the evils of strong drink. That's true. And he's paying the price for it. And I think that's the thrust of why he did not get out of the car immediately and why he did not get on his knees immediately. He was intoxicated. Is there a case that says that in those circumstances, arresting someone who has threatened to use a knife and have another rifle in the car, that the officer has to make nice calculations about the extent of the force that should be used? Well, there are cases with respect to the intoxication issue and not paying attention to the commands that suggest that a jury could find that because the arrestee was intoxicated, that's actually a mitigating factor, that the intoxication actually mitigates the threat that the officer would have or should have felt. And what's your closest case on that issue? It's cited in my brief. I think it's the Shockton case. It's a district court case, but it's a similar case where the arrestee is out in the woods somewhere. He's just in a bathrobe. A burglary is reported. And he, by all accounts, was intoxicated. There's verbiage in that opinion that a jury could find that the fact that he's intoxicated could mitigate the threat. Did that case involve the potential of a weapon? I don't remember there being discussion about a weapon in that case, but certainly there was discussion about a violent crime because there was a report of one, that being a break, a burglary. My law clerks are giving me the signal, Judge, don't say what you think you're going to say, so I won't say it. Well, I'm going to go. It reminds me of that old Marty Robbins song about, don't take your gun to town, son. But I just said it, but disregard it for the record. Okay. Okay. And I'll remain silent the rest of the time until I decide to speak again. Ultimately, Mr. Vester is asking this court to decide that his right to be free from this force, in fact, was clearly established. I'll try to pose something, some statement that has some intellectual content. Does a person in these circumstances have a constitutional right to have their arresting officer adopt or use the least amount of force possible, being the handcuffs behind the hand rather than the armbar? And I watched this video several times, as my colleagues have, and it's a, for those of us who are physically short, I envy people who are tall who can do these things. I think we all have our Clint Eastwood moments when we want to do it, or my Leon Mason moments. But again, getting back to what I hope is something, a question with some content, does a defendant, does a person in this circumstance have a constitutional right to have the arresting officer use a lesser degree of force than, that might have been possible, a lesser degree of force that might have been equally effective without the consequential physical damage to the arrestee? I think the arrestee has a constitutional right to have no more force than necessary under the circumstances used. Well, that's much better stated. Maybe in a couple of hours I could have come up with that. And in this case, there was more force used than what was necessary. The throwing on the face of the hand. After the fact, yes. In hindsight, I think you have a great argument. I mean, a plausible argument. Sure. And in hindsight, also, there was no knife in the car. But once the deputy is dispatched to the scene, and the hands go up, and the hands go to the side, and the hands go on the car, and we're waiting to be cuffed, it's also apparent that there's no knife. And this idea that the officer thinks that he has to use the armbar technique because there may have been a knife is just, I'll submit, ridiculous. Because there's no knife there in his hands. There certainly is no knife when the officer approaches Mr. Vester. And there is no knife when the officer takes Mr. Vester's hands, puts them behind his back, and is ready to cuff him. As I was working on this case, I remembered from that famous statement that Justice Holmes made in Brown v. United States, detached reflection cannot be demanded in the presence of an uplifted knife. Your response is, there was no uplifted knife. There was no knife at all. There was no knife at all. And the video- After the fact. And the video, which gives us a perfect view of Mr. Halleck's point of view at that time, the video also indicates that there was no knife or access to a knife. I'm interrupting. I'm cutting into your rebuttal time, and so I will remain silent. Thank you. Thank you. Good morning. Oh, I'm sorry, counsel. Good morning. You may proceed. And you are, of course, Mr. Fitzgerald. I am, Your Honor. And I suppose you would say, I'll say, well, we've dispatched with Justice Holmes quotation because there was no knife here, we won't worry about the knife. Yes. Your Honor, may it please the court, I'd like to focus on three facts that were discussed by Judge Girard in his decision. But I'd like to amplify them because I think they're important. And these cases are decided on particularized facts. And I think these are three very important particulars. Number one, and the court has asked Mr. Munderloh about this, this is a weapons case. There is, and this case is somewhat unique in these cases decided on summary judgment. There isn't any great dispute with respect to the facts. The facts are that my client, Deputy Halleck, had information that Mr. Vester had been in the 101 bar, that Mr. Vester had threatened people with a knife, that the knife had been taken away from him or at least removed from his possession. And that he had gone back outside in the car or to the car to get a knife. The fact of a weapon in these cases is very significant. And that fact distinguishes both cases that the plaintiff has relied on as this circuit's precedent. Two district court cases, the Garcia case, that was the young teenager who was out on a curfew violation, involved no weapon. The Stockton case, which is the other case that Mr. Munderloh mentioned, involved a fella that probably was in his pajamas and slippers outside and no report of a weapon. On the other hand, the Smith case and the Roberts case, the two cases that Judge Gerard found that were the most similar to this case in this circuit, were both weapons cases. In the Smith case, the claim was that Smith had a rifle. He didn't have it on him when the police officers encountered him, but the claim was that he had been threatening domestic disturbance with a rifle. In the Roberts case, Roberts' family indicated that he had a knife. When these cases include a fact that includes a weapon, the dire consequences to the officer for getting it wrong are substantially increased. The risk of harm to the public and to the police officer substantially increases and the need for immediacy increases. Second, Halleck, the district court judge mentioned this, but this is different and unique from many of the cases. Halleck is alone. The judge refers to the lone officer approaching the car, but it's actually very important here. In Garcia, the case cited by the plaintiff appellant, there's two officers involved against a teenage young lady. In Stockton, there's two officers approaching a frail old man. He's 57, I don't think that's that old, but apparently old, I'll say. But here, Halleck is responding to a potentially dangerous situation as a lone officer, and that's sort of unique in these kinds of cases. And the courts have discussed the difference in sizes between, the comparable sizes between the suspect and the responding officer. But more importantly, I think here is the fact that we have a lone officer who is approaching Halleck alone. And that fact makes this case somewhat unique, and the risk is substantial that if Halleck makes a mistake, his peril is increased. Did the district court find that there was no constitutional violation, or did it find that it wasn't clearly established under these circumstances? District court found that it was not clearly established under these circumstances. The judge utilized and cited the formula, or at least the analysis that Judge Riley used in Roberts and Smith. And then the Smith versus City of Minneapolis case that's cited in the brief in Judge Gerard's decision uses the same analysis on a takedown case in that case. The third and final factor I wanna mention is that the noncompliance by the suspect when Halleck orders him to get on the ground means not that he is simply standing there with his hands out or on the car noncompliantly, but rather that he is now standing in front of an open car door where the officer could apprehend that there's a knife located in the car. When Vester does not get on the ground, he has access and a better location to get to the knife when Halleck must holster his pistol, his handgun, and cuff Halleck. Vester is between the deputy and the open car door. The order to get out of the car, which Vester ultimately complies with, makes his possibility of escape less likely. The order to get on the ground makes the chance of his getting a weapon less likely. This is different than simply noncompliance, making an officer's job more difficult or noncompliant, this is noncompliance that keeps the danger at a high level. Do you agree from looking at the video that it was pretty obvious that he was intoxicated or something was clearly wrong, that's kind of obvious, right? Judge, I agree with that. I don't know that I agree that it's clearly obvious he's intoxicated. There's not really an opportunity to see him stagger. I find- At a minimum, he was like a deer in headlights. My response would be that he was behaving oddly, very oddly. He's not responding, he's not speaking, he's not doing what the officer says. I mean, I agree with you on the noncompliance. But it is a little troubling because he turns toward the car and takes sort of a traditionally submissive position by putting his hands out. Right. And then once he puts his hands down, there's no further command of, you know, continue, don't do that, get down, or anything like that. It's sort of a submissive position. And the officer approaches, and I don't recall both hands coming behind the back. I recall an immediate grab of the right arm and the arm bar. And boy, he goes down like a ton of bricks. That's how I recall. Your Honor, I would think that his several occasions of noncompliance, I think his manner is odd as opposed to being obviously drunk. There's no, he doesn't speak, he doesn't stagger. But he does behave oddly, like he's not hearing it. I don't know whether you could assume he was drunk or on drugs or out of his mind for whatever other reason could possibly exist. Even in his noncompliance, he doesn't make any active resistance or anything that is threatening. Right. I think this is more of a passive resistance kind of case. And the reason I think that the officers, in my opinion, the officers' response is actually objectively reasonable are the three factors that I mentioned when I began this argument, is that this is different. There's weapons. And I think this circuit's cases would show, for example, the Ehlers case, Ehlers versus Rappaport case, just decided this year. Mr. Ehlers was walking away, which was noncompliant, but he wasn't, he was no longer being aggressive at the time of the, and that was not an arm bar takedown, but a spin takedown, and then an arm bar used to cuff him. But I think those three factors make this case one where it was actually objectively reasonable for the officer to behave like he did. And I wanted to mention that Ehlers case is a case that was decided by this court recently, which involves no weapon and no one aggressively responding to the officer. It's just a noncompliance situation. And in that case, as I read it, the decision is based on it being objectively reasonable for the officer to do the spin takedown in that case, and then an arm bar handcuffing procedure that was followed. Let's see here. Finally, and the court has mentioned this, you know, many of the cases, as you read, the deposition testimony being summarized by the court, involve differing sets of facts that the suspect says this, or the suspect's witnesses say this, and the officer and the fellow officers say something different. In this case, essentially, we have no real dispute about the facts. This is the facts. And then we see, in a very poignant manner, on the police officer's dash cam, the violent, abrupt takedown. It is violent, and it is abrupt, but it was necessary. To what extent does the arresting officer's subjective motivation play any part in the constitutional determination? There's something in the briefs about the fact that he told his fellow officers, well, that should teach him a lesson. Yeah, I think I... Was, I don't know, what is the French word? Was his sense of... Or maybe the fellow, the officer's refusal to get on the knees offended the arresting officer's sense of command, and therefore, I will show him not to do this again. The appellant records that particular statement by the officer of, you're going to need stitches for that, or something like that, and maybe some comment to the fellow officer when the officer, another officer, finally arrives. But I don't read that as indicating any kind of subjective intent to... In other words, the test is supposed to be that which a reasonable officer would judge himself to be in peril of, or something like that. But I've often wondered whether that doesn't defy reality, if the evidence is clear that the arresting officer is using this as a pretext to vent his spleen, as it were. Well, anyway, that's not before us. Your Honor, this court has detected some of those situations in its cases where the subsequent handling of the matter indicates that there was some sort of conspiracy between fellow officers to do something like that, and those cases are cited in the brief. I think in the Stockton case, for example, that the appellant cites the court, the district court was very unhappy about the way that the officers handled the incident afterwards as far as reporting and detected some sort of bad intent. The test is as you reported it, though, and under this test, under that test, Deputy Halleck certainly behaved reasonably under the circumstances, and this court has cautioned, obviously, against second-guessing the split-second decisions that need to be made by an officer in a situation like Deputy Halleck was in that day. I've already forgotten. I assume that they did a post-arrest search of the car. Was any second knife ever found? No second knife was found. The first knife was retrieved from the bartender. Well, thank you. Again, the report was that he was going to go out and find one, but that was, well, the officer didn't know that that was a false state. The report was that he went out to his car to get another knife, or he went outside to get another knife. A witness said that. That's not necessarily a false statement. The false would be that, in fact, a knife did not exist. Thank you, Your Honor. Mr. Munderloh, you have some time for rebuttal, which I will let you make uninterrupted by any ruminations on my part. Thank you. First, Judge Grunder, I wanted to take an opportunity to just talk a little bit about the Stockton case. I did go back and look. I didn't see any report about a weapon being relayed to the officers there. But I did want to report a weapon being relayed to the officers in the Stockton case. I don't see anything in the factual description of Stockton that there was any weapon involved. So I wanted to point that out conceded. And it is, in fact, in the Stockton case, where there's language about the fact that the arrestee is intoxicated may very well be considered a factor that mitigates the immediate threat perceived by the reasonable officer on the scene. That's the language from Stockton that I was thinking of. Might that not also aggravate the situation in the sense that people under the influence of substances, to use a neutral word, are likely to act more irrationally than others? Perhaps. And so I think, if anything, it's a factual question. It's under these circumstances, under this particular set of circumstances, would intoxication mitigate the threat or would it aggravate the threat? That's a question for the fact finder not to be resolved. A reasonably objective officer is entitled to assume the worst scenario. But the worst scenario could go either way because... Or the other would be a less worse scenario. With respect to the weapons issue, as I understand Deputy Halleck's argument that Mr. Vester had to get to the ground so that the threat of the weapon or access to the weapon was mitigated to every extent possible to protect Deputy Halleck's safety. And that may be true when he's on the ground. But again, when the hands are on the car and there's no weapon there and Deputy Halleck is right behind him, the threat is similarly mitigated. Thank you. Very well. The case is submitted. We will take it under consideration.